DAVID MEDINA, LIBERTAD G. PANTOJAS, GABINO PADILLA ET AL., Plaintiffs and Appellants, *v.* PUERTO RICO TELEPHONE COMPANY, Defendant and Appellee; GRECIA MALLENS LÓPEZ, GENARITA MERCADO, ÁUREA MARÍA TORRES ET AL., Plaintiffs and Appellants, *v.* PUERTO RICO TELEPHONE COMPANY, Defendant and Appellee.

No. R-64-109.    Decided December 6, 1968.

*Luis G. Estades* for appellants. *McConnell, Valdés, Kelley &
Sifre* and *Baltazar Corrada* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief
Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice
Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

We must decide in this case the scope and significance of
the granting of "a 23-calendar-day annual leave with full
pay" stipulated in the collective bargaining agreements exe-
cuted by the litigants. Appellants argue that it means full
pay for each one of those days while appellee maintains that
it has been paying, correctly, and with the acceptance and
without the objection of the Union, for such vacations, the
pay for each one of the working days included in the 23-
calendar days of the vacation period. In our opinion the trial
judge correctly concluded that the respondent, in so paying,
acted in accordance with the terms of the agreements in
question.

Appellants filed a complaint against appellee alleging that
during the ten years preceding August 1958 appellee has
refused to pay appellants the totality of the 23-day vacation
with full pay as established in the agreements in force. The
record shows that the claim amounts to $350,000 plus an
equal amount as *penalty.*

According to the findings of fact of the trial court

"1. The first Collective Bargaining Agreement between ap-
pellee and the *Unión de Trabajadores de la Industria del Telé-
fono* was executed in 1943. Article IX of said agreement provided
that:

'Every employee of the company who has served for one
year shall be entitled to a fifteen-day annual leave with full
pay.'

"In consonance with the preceding clause, appellee granted
the employees a fifteen-calendar-day vacation during which it
paid them the full pay corresponding to the regular working
days included within the fifteen (15) days. That is, the company

had been granting them an annual leave of 15 days with pay equal to what the employee would have received if he had been working regularly during the 15-calendar-day period. The Union which represented the employees did not challenge said interpretation.

"2. In 1945 another agreement was executed granting 18 and 21 vacation days, according to the years of service. Article IX provides that:

'Every employee of the company who has served more than one year or less than ten years will henceforth be entitled, while in the service of the company, to an eighteen-calendar-day annual leave with full pay, and the employees who have served more than ten (10) consecutive years shall be henceforth, entitled, and while in the service of the company, to a twenty-one-calendar-day annual leave with full pay.'

"The company in interpreting this clause paid the employees as if they had been working regularly during the vacation period and not for every calendar day of vacation.

"The Union did not challenge appellee's interpretation of said clause.

"3. In 1946 another Collective Bargaining Agreement was executed increasing the vacations to 23 days. Article IX of the Agreement provided that:

'Every employee of the company who has served for more than one year shall be entitled, after the first year of service, to a twenty-three (23) calendar-day annual leave with full pay, while in the service of the company.'

"That is, by this agreement the vacations were increased to 23 calendar days. Said clause remained in force without modification in the collective bargaining agreements of 1948, 1950, 1952, 1954, 1956, and 1959 and the interpretation of the same is what has originated the actions brought, since in the case of Medina and others the claim covers the years 1948–1958 and that of Grecia Mallens and others the years 1950–1960.

"As it did in the preceding agreements appellee interpreted said clause to the effect that the 23-calendar-day annual leave with full pay meant that the employees would have vacations during 23 calendar days and that they would receive full pay as if they had been working during the regular days included within said period. This interpretation of the appellee was not chal-

lenged by the Union either, and no complaint was raised before the Adjustment Committee."

The trial court also concluded that:

". . . prior to the approval of the Collective Bargaining Agreement of 1946, the Union representing the workers, and appellee carried out negotiations. At the onset of the negotiations the Union submitted to appellee a proposed Collective Bargaining Agreement, in which they claimed 21 working days, which was not approved by appellee.

". . . If appellee did not accept the 21 working days which were more than 23 calendar days, how can it be possible to establish that in accepting 23 calendar days it was accepting 23 working days, that is, two days more than those claimed by the employees? The answer is clear. . . . According to the testimony of José Domínguez, at that time appellee's Vice-President and General Manager, and the person who represented the company in the negotiations which culminated in the approval of the Collective Bargaining Agreements, 17 working days may result in 23 calendar days or more, and they chose not to accept the 17 working days, but 23 calendar days, since if there was a holiday within the 17 working days, the latter would increase the calendar days. Furthermore, appellee chose the calendar days because that is what they had been doing since 1945 and it had never been challenged, notwithstanding the fact that the employees or the Union had had ample opportunity to present objection and no complaint was filed before the Adjustment Committee, and no modification or clarification of said clause was ever requested. They did not resort either to the Local or National Labor Relations Board to complain that respondent was not complying with said clause or that the interpretation being given to it was causing them prejudice.

"Respondent, during all the transactions of the Collective Bargaining Agreements with the Union which represented the petitioners, always interpreted the clause of a 23-calendar-day annual leave with full pay as meaning that the employees would go on vacations during 23 calendar days and that they would receive full pay as if they had been working during the regular days included in said period, that according to the collective bargaining agreements during the ten years covered by the claims of the above entitled cases, the regular working week in

respondent's enterprise was five eight-hour days. That was the interpretation given by the respondent since 1946 to 1959, said interpretation not being challenged before the Adjustment Committee."

In view of the foregoing the trial court decided that:

"It is our opinion that what the parties had in mind in drafting the Collective Bargaining Agreements was the granting of 23 calendar days equivalent to the working days covered by said period.

"The court decides, as a question of law, that when the parties agreed, in the Collective Bargaining Agreements for the years 1946, 1948, 1950, 1952, 1954, 1956, and 1959, that the employees of the company who have served over one year shall be 'entitled, after the first year of service, to a twenty-three (23) calendar-day annual leave with full pay, while in the service of the company,' the company was bound to pay to petitioners the same pay that the employee would receive if he had been working during the same period. That is, that since the regular working week consisted of five days, respondent was bound to pay during the vacations the salary corresponding to seventeen eight-hour working days."

The trial court dismissed the complaints in these cases.

Petitioners' five assignments of error in this appeal were, actually, two, to wit:

(1) That the admission of oral evidence for the purpose of interpreting the vacation clause in the agreements in question did not lie; and

(2) The trial court erred in weighing the evidence on the true intention of the parties in deciding that the vacation clause in said agreements meant that the vacations would last 23 calendar days and that full pay means the normal or regular pay that said employees would receive if they had been working during said period, that is, during the working days established by the employer, and not altered by the agreements, which were included in said period of 23 calendar days.

1. In support of the first assignment petitioners invoke § 25 of the Law of Evidence[1] (32 L.P.R.A. § 1668) and our decisions in *Luce & Co.* v. *Labor Relations Board*, 86 P.R.R. 402 (1962); *Parίs* v. *Canety*, 73 P.R.R. 386 (1952); and *Collazo* v. *Conesa*, 70 P.R.R. 144 (1949), and other cases cited in *Luce & Co., supra*.

■ The aforementioned provision of our Law of Evidence does not exclude evidence of the circumstances under which the agreements in question were made or to explain an ambiguity. On the other hand § 28 of the Law of Evidence (32 L.P.R.A. § 1671) provides that for the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it may also be shown, so that the judge be placed in the position of those whose language he is to interpret. Furthermore, § 1234 of the Civil Code (31 L.P.R.A. § 3472) provides that "In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."

According to the statement of the case and the findings of fact of the trial court, the litigants stipulated that:

"(a) The respondent interprets the vacation clause of the Collective Bargaining Agreement for the years covered by the

---

[1] Section 25 of the Law of Evidence states:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore, there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreements other than the contents of the writing, except in the following cases:

1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

2. Where the validity of the agreement is the fact in dispute.

But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section 1671 of this title, or to explain an extrinsic ambiguity, or to establish illegality or fraud. The term 'agreement' includes deeds and wills, as well as contracts between parties."

respective claims in the sense that it is bound to pay to petitioners the same pay they would receive if they were working during the 23-day vacation period. The regular working week consists of five (5) working days and each day is composed of eight (8) regular hours. The respondent pays to the petitioners during the vacations the wages corresponding to seventeen (17) eight-hour (8) days which is equivalent to the wages they would receive if they were working regularly during the vacation period.

"(b) The petitioners' contention is that the vacation clause in the aforecited Collective Bargaining Agreements should be interpreted in the sense that respondent is bound to pay each one of the twenty-three (23) days of vacation as if they had worked during each one of said days.

"On respondent's petition and over petitioners' objection, the court, pursuant to the provisions of § 25 of the Law of Evidence and in order to establish which was the true transaction or agreement between the parties in setting forth in the Collective Bargaining Agreements the granting of a 'twenty-three (23) calendar-day annual leave with full pay,' decided to hear the testimony, petitioners having announced that they would not present any direct evidence, relying in the Collective Bargaining Agreements, but reserving the right to present evidence of rebuttal, which they did in their turn."

So that the appellants themselves, by virtue of such stipulation, actually admitted that the aforementioned vacation clause was ambiguous and not clear and that it had been subject to conflicting interpretations and that the controversy demanded an interpretation of the same. In *Luce & Co.,* *supra* as well as in *París, supra,* and *Collazo, supra,* the provisions of the agreement or contract in controversy were clear and indubitable and therefore the literal sense of the same had to be observed. In the case at bar, the parties actually stated the contrary. At law the situation created by the practice followed by the parties in the agreements under discussion, as reflected in the aforementioned stipulation, was that there was "extrinsic ambiguity in the agreements; that in order to elucidate the controversy the vacation clause

had to be interpreted and that it was necessary to determine the intention of the parties." Therefore, it was necessary to present, as it was done, evidence of the circumstances under which the different agreements were executed, of the situation of the parties, of the actions of the latter, coetaneous or subsequent to said agreements, and of the purpose of the parties in executing them, in relation to the vacation provision in said agreements. *Rossy* v. *Super. Ct.; Heirs of Lloréns, Ints.*, 80 P.R.R. 705, 722–723 (1958) ; *Heirs of Marrero* v. *Santiago*, 74 P.R.R. 763, 768 (1953) ; *Caballero* v. *Kogan*, 73 P.R.R. 617 (1952) ; *Ramírez* v. *Ramírez*, 65 P.R.R. 510, 513 (1946) ; *Nicorelli* v. *Ernesto López & Co.*, 26 P.R.R. 49, 52–53 (1917) ; *Hoffman* v. *Cuadrado*, 14 P.R.R. 573 (1908) ; *Judgment of the Supreme Court of Spain* of April 20, 1944; 8-II Manresa, *Comentarios al Código Civil Español* 493–519 (5th ed.).

Therefore, we conclude that the trial court did not err in admitting, considering, and weighing such evidence.

■ 2. The findings of fact of the trial court are justified since there was evidence that:

(a) The agreement of 1943 stipulated a 15-day vacation period with full pay. The company only paid the working days included in said period—there was no objection. Even more, one of the Union advisers inferred that this was due to the fact that the workers had Saturdays and Sundays free without pay.

The minutes of the meeting of the Adjustment Committee created by the agreement to settle the disputes arising from the latter, and held on October 26, 1944, report that "The Adjustment Committee discussed the matter of vacation to the personnel and all of them agreed that the manner in which they were being granted was satisfactory." Hence, the practice of the company of only paying the working days included in the vacation period agreed upon was sanctioned by the parties.

(b) In the agreement of 1945 an 18-calendar-day vacation period with full pay was agreed upon for the employees who had served more than one year and less than ten years, and 21 calendar days with full pay for those who have served more than 10 years. The company continued the practice of only paying the working days included within the calendar days. The Adjustment Committee, in its meeting of March 28, 1946 unanimously agreed "that when an employee goes on vacation and desires advance payment thereof, the *regular* biweekly *check* shall be advanced," which meant the pay corresponding to the working days in the fortnight. (Italics ours.)

According to the testimony of the executives of the company, the latter never received any complaint from the Union of such vacation payment plan nor was the matter taken before the Adjustment Committee or the Labor Relations Board. Company employees who had previously represented the Union in the negotiation of the agreements, testified that they had interpreted said clause of the agreement in harmony with the employer's payment plan and they so explained it at the Union's meeting to consider said agreement, which was later ratified by said assembly; that during the negotiations the Union representatives sought to procure that the vacation period be paid on the basis of working days, but they had to accept it on the basis of calendar days; that the matter was never taken before the Adjustment Committee or the Labor Relations Board.

(c) In the agreement of 1946 the Union requested a 21-working-day vacation. The latter so included it in its draft of the agreement. But the clause finally adopted provided for 23 calendar days with full pay, although the Union tried to obtain 23 working days. During the negotiations of said agreement the Union did not challenge the vacation payment plan established by the company under the agreement in force which limited the payment to the 17 working days within

the 23 calendar days of vacation, nor did it try to clarify the situation, except as to the point of seeking to procure 21 working days and later 23 working days. It was reasonable to conclude that if the company refused to accept a 21-working-day vacation period it would undoubtedly not accept to pay for every one of the 23 calendar days, since this would mean that it would pay for two days more than those to which it had previously objected. Furthermore, paying for Saturdays and Sundays during the vacation period would imply that the employee would receive a higher remuneration during his vacation than when he was working, since in the latter case he would not receive any pay for Saturdays and Sundays.

Petitioners' witnesses denied that in agreeing to establish the 23-calendar-day vacation period the payment was limited to the working days and denied that it was so explained in the meeting of the Union. One of the Union advisers testified that on being consulted on said payment plan, he advised them to take the matter before the Adjustment Committee, but that he did not know whether they did it or not. He added that they did not try to clarify it during the negotiations for the next agreement "understanding [the Union negotiation committee] that appeal had been taken requesting the enterprise's compliance with the same [the vacation clause] without affecting the relations between the Union and the enterprise." The other Union adviser testified that when the controversy arose, he advised that the matter be directly discussed with the company and not through the Adjustment Committee and that "in the event that no agreement were reached with the company, collective negotiations could be opened in the next collective bargaining agreement to make the clarifications. . . . Furthermore, I indicated they were always entitled to resort to court and substantiate their claim in court." He admitted, however, that although he knew about the discrepancy in relation to the vacation payment

plan, they did not seek to clarify the same in the negotiation of the subsequent agreements because "At the collective bargaining agreement discussions it continued to be evident for us that the words calendar days were consecutive days, and by merely saying calendar days and not working days, but not eliminating Saturdays, Sundays and holidays. As you may see, they agreed on that point, and although they do not discuss the payment of said days, which they are not paying, they will have to pay because the company is mistaken in said interpretation, and the fellow workers interpret it that way." The adviser explained how it was agreed that the vacation period would be 23 calendar days. To that effect he testified that in the negotiation of the 1944–1945 agreement the Union requested a 30-working-day vacation. The company objected, it being inconvenient and too costly, to have an employee out of service for a period corresponding to 40 calendar days; for that reason they settled for 18 and 21 calendar days with full pay which included Saturdays and Sundays; that "Twenty-three calendar days with pay is more advantageous to the company than twenty-one working days with pay, because herein they refer to twenty-one working days with pay. The worker is absent from his job possibly twenty-eight days, that is, counting the twenty-one days, Saturdays and Sundays, he has to keep on adding, the worker is absent twenty-six or twenty-eight days. That means that if the company needs that the work be done, it had to pay another person and it is more costly for them to pay twenty-one days to another person and to pay the employee. That is why I am stating it more clearly. If the company agrees to grant twenty-three calendar days the worker is going to be absent only twenty-three days. That is cheaper, to pay two extra days and have the worker absent twenty-three days, than to pay that to the other person. If I am absent twenty-one working days with pay, eight days without pay."

We conclude that the trial court did not err in giving no credit to the testimony of appellants' witnesses, especially when their two principal witnesses, their legal advisers, admitted having had knowledge of the controversy and one of them advised that the latter be raised before the Adjustment Committee and the other that it be directly discussed with appellee. Apparently, the Adjustment Committee did not consider objectionable appellee's practice of only paying the working days included in the calendar days of the vacation period. The steps to procure that the company pay for every one of the calendar days were taken directly with the latter and during the negotiation of the agreement for 1946–47, but they were unsuccessful.

In view of the foregoing, the judgment rendered by the trial court in this case will be affirmed.